| | |
|---|---|
| JAMES R. BUESCHER, individually, and as a representative of a Class of Participants and Beneficiaries of the North American Lighting, Inc. Command Plus Plan and the North American Lighting, Inc. Group Health and Life Insurance Plan, | |
| Plaintiff, | Case No: 2:24-02076 |
| v. | |
| NORTH AMERICAN LIGHTING, INC. | |
| and | |
| BOARD OF DIRECTORS OF NORTH AMERICAN LIGHTING, INC., | |
| and | |
| ADMINISTRATIVE COMMITTEE OF THE NORTH AMERICAN LIGHTING, INC. COMMAND PLUS PLAN, | |
| and | |
| ADMINISTRATIVE COMMITTEE OF THE NORTH AMERICAN LIGHTING, INC. GROUP HEALTH AND LIFE INSURANCE PLAN | |
| Defendants. | |

## COMPLAINT

COMES NOW Plaintiff, James R. Buescher ("Plaintiff"), individually and as a representative

of a Class of Participants and Beneficiaries of the North American Lighting, Inc. Command Plus

Plan (the "NAL 401(k) Plan"), and the North American Lighting, Inc. Group Health and Life Insurance Plan (the "NAL Health Plan"), by his counsel, WALCHESKE & LUZI, LLC, and HASSLER KONDRAS MILLER LLP, as and for a claim against Defendants, alleges and asserts to the best of his knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, the following:

## INTRODUCTION

1.     This Complaint alleges two different type of ERISA fiduciary breach claims: (1) an ERISA claim for fiduciary breach of prudence for Defendants charging excessive and unreasonable Bundled recordkeeping and administrative (RKA) fees under the NAL 401(k) Plan (Counts I and II); and (2) an ERISA claim for unlawful tobacco surcharges, charged against tobacco-using employees and their spouses under the NAL Health Plan (Counts III, IV, and V).

## JURISDICTION AND VENUE

2.     This Court has subject matter jurisdiction in this ERISA matter under 28 U.S.C. § 1331 and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001 *et seq*.

3.     This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and have significant contacts with this District, and because ERISA provides for nationwide service of process.

4.     Venue is appropriate in this District within the meaning of 29 U.S.C. §1132(e)(2) because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District.

5.     In conformity with 29 U.S.C. §1132(h), Plaintiff served the Complaint by certified mail on the Secretary of Labor and the Secretary of the Treasury.

## PARTIES

6.     Plaintiff, James R. Buescher, is a resident of the State of Illinois and currently resides in Paris, Illinois, and during the Class Period, was a participant in both the NAL 401(k) Plan and the NAL Health Plan under ERISA § 3(7), 29 U.S.C. § 1002(7).

7.     Plaintiff was an engineering technician at the NAL location at 2275 S. Main Street, Paris, Illinois, 61944, from January 2015 through September 2023.

8.     During the Class Period, Plaintiff invested in the Principal Lifetime Hybrid 2055 CIT Fund in the NAL 401(k) Plan. He rolled his assets out of the Plan at the end of 2023.

9.     Plaintiff has Article III standing to bring this action on behalf of both the NAL 401(k) Plan and the NAL Health Plan because he suffered actual injuries by paying excessive Bundled RKA fees as part of the NAL 401(k) Plan and by paying unlawful tobacco surcharges under the NAL Health Plan during the Class Period. Those injuries are fairly traceable to Defendants' unlawful conduct in maintaining Principal as the NAL 401(k) recordkeeper and by Defendants themselves collecting the unlawful tobacco surcharge, and that harm is likely to be redressed by a favorable judgment providing appropriate equitable relief to the Plaintiff and Class.

10.    Having established Article III standing, Plaintiff may seek recovery under 29 U.S.C. § 1132(a)(2), ERISA § 502(a)(2), on behalf of the Plans and for relief that sweeps beyond his own injuries.

11.    The Plaintiff and all participants in the Plan did not have knowledge of all material facts (including, among other things, the excessive Bundled RKA and tobacco surcharges) necessary to understand that Defendants breached their fiduciary duties until shortly before this suit was filed.

12.    Having never managed a mega 401(k) Plan or group health plan, Plaintiff, and all participants in the Plan, lacked actual knowledge of reasonable RKA fee levels available to the

Plan or that they should have been fully reimbursed for tobacco surcharges once having completed a tobacco cessation program provided by NAL.

13.     North American Lighting, Inc. ("NAL"), a fully-owned subsidiary of Koito Manufacturing of Japan, is an American leading supplier of automotive lighting systems in North America. On the Plan's 2022 5500 form, it lists its address as 2275 S. Main Street, Paris, IL 61944. In this Complaint, "NAL" refers to the named Defendants and all parent, subsidiary, related, predecessor, and successor entities to which these allegations pertain.

14.     NAL acted through its officers, including its Board of Directors, to perform Plan-related fiduciary functions in the course and scope of their business. NAL and its Board appointed other Plan fiduciaries on Administration Committees of the NAL 401(k) Plan and NAL Health Plan (collectively "Plan Committees"), and accordingly had a concomitant fiduciary duty to monitor and supervise those appointees.  For these reasons, NAL and its Board are fiduciaries of the Plan, within the meaning of 29 U.S.C. § 1002(21)(A).

15.     The NAL 401(k) Plan is administered by the Administration Committee of the NAL 401(k) Plan and the NAL Health Plan is administered by the Administration Committee of the NAL Health Plan.  As the Plan Administrators, the Administration Committees are fiduciaries with day-to-day administration and operation of their respective Plans under 29 U.S.C. § 1002(21)(A). The Plan Committees have authority and responsibility for the control, management, and administration of their respective Plan in accord with 29 U.S.C. § 1102(a), with all powers necessary to properly carry out such responsibilities.

## EXCESSIVE BUNDLED RKA FEES UNDER NAL 401(K) PLAN

16.     Plaintiff is a "participant" in a defined-contribution plan under ERISA Section 3(7), 29 U.S.C. § 1002(7): the NAL 401(k) Plan.

17.     The NAL 401(k) Plan is a Section 401(k) "defined contribution" pension plan under 29 U.S.C. § 1002(34), meaning that North American Lighting, Inc. ("NAL") contributes to the payment of Plan costs is guaranteed but the pension benefits are not. In a defined contribution plan, the value of participants' investments is "determined by the market performance of employee and employer contributions, less expenses." *Tibble v. Edison Int'l,* 575 U.S. 5, 525 (2015).

18.     As a defined-contribution plan, the NAL 401(k) Plan allows participants to direct the investment of their contributions, but the investment options included in the NAL 401(k) Plan are selected by the NAL 401(k) Plan's fiduciary.

19.     NAL, as the employer, is the administrator and fiduciary of the NAL 401(k) Plan. NAL assigned fiduciary administrative duties to the Administrative Committee of the NAL 401(k) Plan, and to their members.

20.     Plaintiff alleges two ERISA violations against Defendants with regard to the NAL 401(k) Plan: (1) a violation of the duty of prudence by the Administrative Committee under 29 U.S.C. § 1104(a)(1) for allowing the Plan recordkeeper, Principal Life Insurance Company ("Principal"), to charge excessive Bundled RKA fees; and (2) a claim against NAL and its Board of Directors for failure to monitor the Administrative Committee with regard to excessive Plan Bundled RKA fees.

21.     Count I alleges a breach of fiduciary duty by Defendants for incurring unreasonable Bundled RKA fees. Among other things, Defendants paid *an 85% premium* per-participant for Bundled RKA fees for the Plan to the Plan recordkeeper, Principal. Defendants should have lowered its Bundled RKA expenses by soliciting bids from competing providers and using its massive size and correspondent bargaining power of the Plan to negotiate for fee rebates.

22. Count II alleges a breach of fiduciary duty by NAL and its Board for failing to monitor those members of its Administration Committees responsible for paying reasonable Bundled RKA fees.

23. Under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*, plan fiduciaries must discharge their duty of prudence "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B).

24. "In determining the contours of an ERISA fiduciary's duty, courts often must look to the law of trusts." *Tibble v. Edison Int'l*, 575 U.S. 523, 528–29 (2015). The Supreme Court has stated that "a trustee has a continuing duty to monitor trust investments and remove imprudent ones ... separate and apart from the trustee's duty to exercise prudence in selecting investments at the outset." *Id.* at 529. "If the fiduciaries fail to remove an imprudent investment from the plan within a reasonable time, they breach their duty." *Hughes v. Northwestern Univ.*, 142 S. Ct. 737, 742 (2022) (citing *Tibble*, 575 U.S. at 529–30). This continuing duty to monitor is a subset of the duty of prudence, *Tibble*, 575 U.S. at 529–30, and includes two related components. *Hughes v. Northwestern Univ.*, 63 F. 4th 615, 626-627 (7th Cir. 2023) ("*Hughes II*").

25. First, the duty of prudence requires a plan fiduciary to systematically review its funds both at the initial inclusion of a particular fund in the plan and at regular intervals to determine whether each is a prudent investment.

26. Second, the duty of prudence requires a plan fiduciary to "incur only costs that are reasonable in amount and appropriate to the investment responsibilities of the trusteeship." *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197 (9th Cir. 2016) (quoting RESTATEMENT (THIRD) OF

TRUSTS § 90(c)(3*)).* "Expenses, such as management or administrative fees, can sometimes significantly reduce the value of an account in a defined-contribution plan." *Tibble*, 575 U.S. at 525.

27.     Plan fiduciaries have a continuing duty to monitor their expenses to make sure that they are not excessive with respect to the services received. *See Tibble*, 843 F.3d at 1197 ("[A] trustee is to 'incur only costs that are reasonable in amount and appropriate to the investment responsibilities of the trusteeship.'" (quoting RESTATEMENT (THIRD) OF TRUSTS § 90(c)(3))).

28.     Although "a fiduciary need not constantly solicit quotes for recordkeeping services to comply with its duty of prudence, . . . fiduciaries who fail to monitor the reasonableness of plan fees and fail to take action to mitigate excessive fees—such as by adjusting fee arrangements, soliciting bids, consolidating recordkeepers, negotiating for rebates with existing recordkeepers, or other means—may violate their duty of prudence." *Hughes II*, 63 F. 4th at 626.

29.     Defendants, North American Lighting, Inc. ("NAL"), the Board of Directors of North American Lighting, Inc. ("Board"), and the Administration Committee of the North American Lighting, Inc. Command Plus Plan (collectively "Defendants"), are ERISA fiduciaries as they exercise discretionary authority or discretionary control over the 401(k) defined contribution pension plan – known as the NAL 401(k) Plan – that it sponsors and provides to its employees.

30.     During the putative Class Period (April 10, 2018, through the date of judgment), Defendants, as fiduciaries of the Plan, as that term is defined under ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duty of prudence they owed to the Plan by requiring the Plan

to "pay[ ] excessive [Bundled] recordkeeping [and administrative (RKA)] fees," *Hughes*, 142 S. Ct. at 739-740, and by failing to remove their high-cost recordkeeper, Principal.[1]

31.     In 2022, the NAL 401(k) Plan had about $395,214,595 in assets entrusted to the care of the Plan's fiduciaries. The NAL 401(k) Plan thus had enormous bargaining power regarding Plan fees and expenses. Defendants, however, did not regularly monitor Principal to ensure that Principal remained the prudent and objectively reasonable choices to provide Bundled RKA services.

32.     With 5,729 participants in 2022, the Plan had more participants than 99.71% of the defined contribution Plans in the United States that filed 5500 forms for the 2022 Plan year. Similarly, with $395,214,595 in assets in 2022, the Plan had more assets than 99.66% of the defined contribution Plans in the United States that filed 5500 forms for the 2022 Plan year.

33.     ERISA's duty of prudence applies to the conduct of the plan fiduciaries in negotiating Bundled RKA fees based on what is reasonable (not the *cheapest* or *average*) in the applicable market.

34.     There is no requirement to allege the actual inappropriate fiduciary actions taken because "an ERISA plaintiff alleging breach of fiduciary duty does not need to plead details to which he has no access, as long as the facts alleged tell a plausible story." *Allen v. GreatBanc Tr. Co.*, 835 F.3d 670, 678 (7th Cir. 2016).

35.     The unreasonable Bundled RKA fees paid inferentially and plausibly establishes that an adequate investigation would have revealed to a reasonable fiduciary that the Plan Bundled RKA services, given their level and quality, were improvident.  The facts alleged below show that

---

[1] Based on Form 5500s dating back to 2009, Principal has been the recordkeeper for the Plan for fifteen years or more.

a prudent fiduciary would have taken steps to reduce these Plan fees. *See Hughes II*, 63 F. 4th at 628.

36.     There is no "obvious alternative explanation that suggests [that Defendants'] conduct falls within the range of reasonable judgments a fiduciary may make based on [their] experience and expertise." *Id.*  Defendants' fiduciary decisions fall outside the range of reasonableness. *Id.* at 629.

37.     These breaches of fiduciary duty caused Plaintiff and Class Members millions of dollars of harm in the form of lower retirement account balances than they otherwise should have had in the absence of these unreasonable Plan fees.

38.     To remedy these fiduciary breaches, Plaintiff bring this action on behalf of the Plan under 29 U.S.C. § 1132(a)(2) to enforce Defendants' liability under 29 U.S.C. § 1109(a), to make good to the Plan all losses resulting from these breaches.

## ERISA'S FIDUCIARY PRUDENCE STANDARDS IN THE 401(K) INDUSTRY

39.     Employers must: (1) establish a prudent process for selecting service providers; (2) ensure that fees paid to service providers are reasonable in light of the level and quality of services provided; and (3) monitor service providers once selected to make sure they continue to be prudent choices.

### Recordkeeping and Administration ("RKA") Services

40.     Defined contribution plan fiduciaries of very large 401(k) plans hire service providers to deliver a retirement plan benefit to their employees. There is a group of national retirement plan services providers commonly and generically referred to as "recordkeepers," that have developed bundled service offerings that can meet all the needs of massive retirement plans with a prudent and materially similar level and caliber of services. Principal is one such recordkeeper.

41.     There are numerous recordkeepers in the marketplace who are equally capable of providing a high level of service to these very large 401(k) plans like the NAL Plan.

42.     All else being equal, the more participants a plan has, a recordkeeper will be able to provide a lower fee per participant to provide materially similar Bundled RKA services to maintain the same profit margin rate.

43.     There are generally three types of RKA services provided by all recordkeepers.

44.     The first type, "Bundled RKA" services, may include:

    a.     Recordkeeping;

    b.     Transaction Processing (which includes the technology to process purchases and sales of participants' assets as well as providing the participants the access to investment options selected by the plan sponsor);

    c.     Administrative Services related to converting a plan from one recordkeeper to another recordkeeper;

    d.     Participant communications (including employee meetings, call centers/phone support, voice response systems, web account access, and the preparation of other communications to participants, e.g., Summary Plan descriptions and other participant materials);

    e.     Maintenance of an employer stock fund;

    f.     Plan Document Services which include updates to standard plan documents to ensure compliance with new regulatory and legal requirements;

    g.     Plan consulting services including assistance in selecting the investments offered to participants;

    h.     Accounting and audit services including the preparation of annual reports, e.g., Form 5500;

    i.     Compliance support which would include, e.g., assistance interpreting plan provisions and ensuring the operation of the plan follows legal requirements and the provisions of the plan;

> j.    Compliance testing to ensure the plan complies with Internal Revenue non-discrimination rules; and
>
> k.    Trustee / custodian services.

45.    The January 11, 2024 NAL ERISA 404 Retire Plan and Investment Information Disclosure states: "To cover items such as recordkeeping, participant website access, participant statements, Plan compliance services and financial professional services, the following annual Plan administrative expense(s) will be calculated and applied to your account balance each Frequency period: [$58 per year for active and inactive participants]."

46.    Additionally, the January 11, 2024 disclosures states: "There may be additional Plan expenses during normal Plan operation for services such as legal, auditing, other service provider, consulting or investment advice. The Plan Fiduciary determines how these expenses are allocated at the time the expenses are paid. These expenses are typically allocated among participants based on participant account balance, but may be allocated by dividing the total expenses to be deducted by the total number of participants in the Plan."

47.    The Bundled RKA fees are made up of this flat Plan administrative expense of $58 per year, plus an additional amount for professional and consulting services. As discussed below, these additional amounts have added up to $38 per participant per year, for a total Bundled RKA rate for Plan participants of $96 per year.

48.    The NAL 401(k) Plan provides participants all the commoditized and fungible Bundled RKA services provided to all other similarly-sized 401(k) plan participants. The quality or type of Bundled RKA services provided by competitor recordkeepers are comparable to that provided by Principal.

49.     Since well before 2015, industry experts have maintained that for very large retirement plans like the NAL 401(k) Plan, prudent fiduciaries treat Bundled RKA services as a commodity with little variation in price. "Custody and recordkeeping are 'commodity' services. Like any commodity, given equal quality, the key benchmark for these services is price. The cheaper you can find competent custody and recordkeeping services, the better for participants." Eric Droblyen, *Evaluating 401(k) Providers: Separating Commodity from Value-Added Services*, https://www.employeefiduciary.com/blog/evaluating-401k-providers-separating-commodity-value-added-services (Feb. 10, 2015).

50.     Because RKA services are commoditized and fungible, recordkeepers primarily differentiate themselves based on price, and will aggressively bid to offer the best price in an effort to win the business, particularly for mega plans like the Plan. *Hughes II*, 63 F. 4th at 632.

51.     Bundled RKA services are essentially fungible and the market for them is highly competitive. This highly competitive RKA market is filled with equally capable recordkeepers who can provide comparable services for less than Principal.

52.     The second type of essential RKA services, hereafter referred to as "A La Carte services," provided by all recordkeepers, often have separate, additional fees based on the conduct of individual participants and the usage of the service by individual participants (usage fees). These "A La Carte RKA" services typically include the following:

    a.      Loan processing;

    b.      Brokerage services/account maintenance;

    c.      Distribution services; and

    d.      Processing of Qualified Domestic Relations Orders (QDROs).

53.     According to the January 11, 2024 NAL ERISA 404 Retire Plan and Investment Information Disclosure, the Plan provided all such standard A La Carte usage services as other similar mega 401(k) plans do.

54.     The third type of RKA fees are "Ad Hoc" fees which are transaction fees and other administrative fees, and include such things as ESOP fees, fees for service, and terminated maintenance fees.

55.     According to the January 11, 2024 NAL ERISA 404 Retire Plan and Investment Information Disclosure, the Plan paid all the Ad Hoc RKA fees set out above and just like other comparable mega plans do.

56.     The sum of the Bundled RKA fees, A La Carte RKA fees, and Ad Hoc RKA fees equals the Total RKA fees.

57.     Because the RKA offerings are commoditized and fungible among all recordkeepers who provide services to very large plans, like the NAL plan, it is the standard and prevailing practice for retirement plan consultants and advisors to request quotes by asking what the recordkeeper's "revenue requirement" is on a per participant basis for providing the Bundled RKA services.

58.     In most cases, differences in fee rates for the A La Carte and Ad Hoc services are immaterial in determining the total fees charged by recordkeepers.

59.     Retirement plan consultant and advisors primarily use the Bundled RKA fee rate of different recordkeepers to make fee rate comparisons and determine whether the Bundled RKA fee rate is reasonable.

60.     Fidelity, the largest 401k recordkeeper in the country, has conceded that the RKA services that it provides to mega Plans are commodified, including the plan services provided to its own employees.

61.     As part of stipulated facts in a previous case, Fidelity stated: "The value of the recordkeeping services that Fidelity provided to the Plan in 2014 was $21 per participant; the value of the recordkeeping services that Fidelity provided to the Plan in 2015 and 2016 was $17 per participant, per year, and the value of the recordkeeping services that Fidelity has provided to the Plan since January 1, 2017 is $14 per participant, per year. Had the Plan been a third-party plan that negotiated a fixed fee for recordkeeping services at arm's length with Fidelity it could have obtained recordkeeping services for these amounts during these periods. The Plan did not receive any broader or more valuable recordkeeping services from Fidelity than the services received by any other Fidelity-recordkept plan with at least $1 billion in assets during the Class Period (November 18, 2014 to the present)." See *Moitoso v. FMR LLC, et al.*, 1:18-CV-12122-WGY, Stipulation of Facts, Dkt. 128-67, at 4-5 (D. Mass. Sep. 6, 2019) (emphasis added).

62.     The investment options selected by plan fiduciaries often have a portion of the total expense ratio allocated to the provision of recordkeeping performed by the recordkeepers on behalf of the investment manager.

63.     Recordkeepers often collect a portion of the total expense ratio fee of the mutual fund in exchange for providing services that would otherwise have to be provided by the mutual fund. These fees are known as "revenue sharing" or "indirect compensation."

64.     The January 11, 2024 NAL ERISA 404 Retire Plan and Investment Information Disclosure explains that, "[a] portion of the total investment expense of the Plan's investment op-

tions may contain revenue sharing. Any revenue sharing received from the Plan's investment options will be credited back in full to the impacted participant as a fee adjustment pursuant to the frequency of receipt of the Expected Revenue; either monthly or quarterly."

65. The NAL Plan paid direct Bundled RKA fees, but credited back indirect Bundled RKA fees to Plan participants, during the Class Period.

**STANDARDS FOR PRUDENT FIDUCIARIES REGAARDING RECORDKEEPERS**

66. Prudent plan fiduciaries ensure they are paying only reasonable fees for recordkeeping by engaging in an "independent evaluation," see *Hughes*, 142 S. Ct. at 742, and soliciting competitive bids from other recordkeepers to perform the same level and quality of services currently being provided to the Plan. *See, e.g.,* U.S. DEPARTMENT OF LABOR, *Understanding Retirement Plan Fees and Expenses*, at 6, https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/understanding-retirement-plan-fees-and-expenses.pdf (last visited Oct. 10, 2022) ("Once you have a clear idea of your requirements, you are ready to begin receiving estimates from prospective providers. Give all of them complete and identical information about your plan and the features you want so that you can make a meaningful comparison. This information should include the number of plan participants and the amount of plan assets as of a specified date.")

67. Prudent plan fiduciaries can easily receive a quote from other recordkeepers to determine if their current level of recordkeeping fees is reasonable in light of the level and quality of recordkeeper fees. It is not a cumbersome or expensive process.

68. It is the standard of care prevailing among industry experts to solicit competitive bids every three to five years. *See* CAPTRUST, *Understanding and Evaluating Retirement Plan Fees | Part One: A Holistic Approach*, https://www.captrust.com/understanding-and-evaluating-

retirement-plan-fees-part-one-a-holistic-approach/ (stating "best practice is . . . a more formal recordkeeper search and selection process conducted approximately every three to five years. Recordkeeping and administrative fees should be evaluated and compared to plans of similar size and type that are receiving analogous services. While each plan is unique—making an apples-to-apples comparison imperfect—evaluating fees against similarly situated and sized plans provides a good reference point in helping to determine if plan fees are reasonable.").

69.     Having received bids, prudent plan fiduciaries can negotiate with their current recordkeeper for a lower fee or move to a new recordkeeper to provide a materially identical level and qualities of services for a more competitive reasonable fee if necessary.

70.     A benchmarking survey, from Fiduciary Benchmarks or similar companies, alone is inadequate. Such surveys skew to higher "average prices," that favor inflated recordkeeping fees. To receive a truly "reasonable" recordkeeping fee in the prevailing market, prudent plan fiduciaries engage in solicitations of competitive bids on a regular basis.

71.     Prudent fiduciaries implement three related processes to prudently manage and control a plan's RKA costs. *Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014).

72.     First, a hypothetical prudent fiduciary tracks the recordkeeper's expenses by demanding documents that summarize and contextualize the recordkeeper's compensation, such as fee transparencies, fee analyses, fee summaries, relationship pricing analyses, cost-competitiveness analyses, and multi-practice and standalone pricing reports.

73.     Second, to make an informed evaluation as to whether a recordkeeper is receiving no more than a reasonable fee for the quality and level of services provided to a plan, prudent hypothetical fiduciaries must identify all fees, including direct compensation and revenue sharing being paid to the plan's recordkeeper.

74.     Third, a hypothetical plan fiduciary must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, as well as the recordkeeping rates that are available. By soliciting bids from other recordkeepers, a prudent plan fiduciary can quickly and easily gain an understanding of the current market for the same level and quality of record-keeping services.

75.     Accordingly, the best way to determine the *reasonable*, as opposed to the *cheapest* or *average*, market price for a given quality and level of Bundled RKA services is to obtain competitive bids from other providers in the market. *Hughes II*, 63 F.4th at 625-626 (although "a fiduciary need not constantly solicit quotes for recordkeeping services to comply with its duty of prudence, . . . fiduciaries who fail to monitor the reasonableness of plan fees and fail to take action to mitigate excessive fees—such as by adjusting fee arrangements, soliciting bids, consolidating recordkeepers, negotiating for rebates with existing recordkeepers, or other means—may violate their duty of prudence.").

## NAL 401(K) PLAN PAID UNREASONABLE BUNDLED RKA FEES TO PRINCIPAL

76.     A plan fiduciary must continuously monitor its Bundled RKA fees by regularly conducting an independent evaluation of those fee to ensure they are reasonable and remove recordkeepers if those fees are unreasonable. *See Hughes*, 142 S. Ct. at 742.

77.     During the Class Period, Defendants failed to regularly monitor the Plan's Bundled RKA fees paid to Principal.

78.     During the Class Period, Defendants failed to regularly solicit quotes and/or competitive bids from recordkeepers, including but not limited to Principal, in order to avoid paying unreasonable Bundled RKA fees.

79.     During the Class Period, and unlike a hypothetical prudent fiduciary, Defendants followed a fiduciary process that was ineffective given the objectively unreasonable Bundled RKA fees it paid to Principal and in light of the level and quality of RKA services it received that were materially similar to services available through other recordkeepers and provided to other similarly-sized plans.

80.     As set forth in the table below, from the years 2018 through 2022, based upon information provided by the Plan fiduciaries to Plan participants in the Fee Disclosures under Section 404(a)(5), the Plan paid an effective average annual Bundled RKA fee of $96 per participant.

### Bundled Recordkeeping and Administration (Bundled RKA) Fees

|  | 2018 | 2019 | 2020 | 2021 | 2022 | *Average* |
|---|---|---|---|---|---|---|
| Participants | 5,991 | 5,850 | 5,698 | 5,627 | 5,729 | *5,779* |
| Est. Bundled RKA Fees | $575,136 | $561,600 | $547,008 | $540,192 | $549,984 | *$554,784* |
| Est. Bundled RKA Per Participant | $96 | $96 | $96 | $96 | $96 | *$96* |
| Reliable Est. of Reasonable Bundled RKA Fees | $311,532 | $304,200 | $296,296 | $292,604 | $297,908 | *$300,508* |
| Reliable Est. of Reasonable Bundled RKA Fees Per PP | $52 | $52 | $52 | $52 | $52 | *$52* |

81.     The table below illustrates the annual Bundled RKA fees paid by similarly-sized plans, receiving a materially similar level and quality of Bundled RKA services, compared to the annual Bundled RKA fees paid by the Plan (as identified in the table above).

| Plan | Partici-pants | Bundled RKA Fee ($) | Bundled RKA Fee ($/pp) | Record-keeper |
|---|---|---|---|---|
| Doosan 401(K) Plan | 4,050 | $279,450 | $69 | Fidelity |
| Dana Retirement Savings Plan | 4,719 | $198,198 | $42 | Vanguard |
| Komatsu Mining Corp. Retirement Savings Plan | 5,235 | $256,515 | $49 | Fidelity |
| **North American Lighting Plan 2021 Fee** | **5,627** | **$540,192** | **$96** | **Principal** |
| Mercedes-Benz USA, LLC Employees' Retirement Savings Plan | 5,659 | $294,268 | $52 | Voya |
| Bunzl USA, LLC Deferred Savings Plan | 6,657 | $319,536 | $48 | Vanguard |

| | | | | |
|---|---|---|---|---|
| Millerknoll Retirement Plan | 7,205 | $353,045 | $49 | Vanguard |
| Kirkland & Ellis LLP Defined Contribution 401(K) Savings Plan | 7,248 | $333,408 | $46 | Vanguard |

82.     To provide evidence that the Plan paid unreasonable and excessive fees for Bundled RKA services, the Plaintiff considered the Bundled RKA fee rates set forth in participant fee disclosures of other comparable plans.

83.     The evidence of the Bundled RKA fee rates paid by these comparable plans provides evidence that the Bundled RKA fees paid by the NAL 401(k) Plan were excessive and unreasonable and leads to a plausible inference that the Plan fiduciaries employed an imprudent fiduciary process.

84.     Plaintiff does not definitively contend that the fiduciaries of these comparable plans followed a prudent process. Rather, the Bundled RKA fee rates paid by each of these comparable plans provides evidence that the NAL 401(k) Plan paid excessive fees because there are no RKA services offered by any recordkeeper that would warrant or reasonably explain the disparity between the effective Bundled RKA fee rate paid by the NAL 401(k) Plan and the Bundled RKA fee rate that other comparable plans received for materially similar Bundled RKA services during the Class Period.

85.     That being said, the market for Bundled RKA services is not transparent.  In most cases the Participant Fee Disclosure documents are not publicly available and are not published by recordkeepers.  Plaintiff does not have the ability to obtain the participant fee disclosure documents for all plans that have a range of participants similar to the Plan.

86.     As set forth in the Plan's Q1 through Q3 Participant Statements, Plaintiff had fees deducted from his account and paid to the service provider(s) for "plan administrative expenses"

in an amount of $24 per quarter on average for the period January 1, 2023 through September 31, 2023.

87.     Accordingly, under the Plan's fee structure, the Plan paid an annual Bundled RKA fee rate of $96/pp in 2023. That is calculated using the Plan's quarterly participant fee rate of $24 multiplied by four.

88.     Bundled RKA fees paid by other plans with a similar number of participants were much lower.

89.     Each of the comparable plans identified below is among the closest 18/100th of 1% (0.18%) of all the defined contribution plans covered by ERISA.

90.     More specifically, there were around 657,265 plans in 2018 and only 1,179 plans had between 4,050 and 7,248 participants with a balance greater than zero at year-end. Therefore, 656,086 plans or 99.82% of all plans have either less than 4,050 or more than 7,248 participants. Hence, plans containing between 4,050 and 7,248 participants are among the most meaningful and appropriate to use as similarly-situated comparable plans and are superior to the remaining 99.82% of all the defined contribution plans governed by ERISA.

91.     The following paragraphs outline the Bundled RKA fees reported by the comparator plans for the same buffet of all-you-can-eat, Bundled RKA services provided to all plans similarly-sized to the NAL 401(k) Plan.

92.     **Doosan 401(k) Plan** ("Doosan"): The comparable annual Bundled RKA fee rate of $69/pp is taken directly from the "Plan Administrative Fees and Expenses" section of the Participant Fee Disclosure Notice produced on October 25, 2021.  The section indicates the "Recordkeeping Fee" is $69 per year deducted quarterly.

93.     The Doosan plan is a meaningful benchmark because at the end of 2021 the Doosan plan had 4,050 participants, slightly less than the 5,627 participants in the Plan. The costs to a recordkeeper for providing RKA services to a plan with more than 3,000 participants are driven primarily by the number of participants. There are no material differences in the RKA services provided to plans as large as both the Doosan plan and the Plan and any service differentials cannot explain the disparity between the fees paid by the Doosan plan and the fees paid by the Plan.

94.     For example, the disparity of $27/pp between the $69/pp Bundled RKA rate for the Doosan plan's fee compared to the Bundled RKA rate of $96/pp paid by the Plan represents over $150,000 annually and would conservatively represent more than 3,000 hours of RKA services in one year provided by employees of the recordkeeper.

95.     As a result, the primary driver of the Bundled RKA fee rate that recordkeepers would initially bid to provide RKA services is the number of participants in the plan. Therefore, all else being equal, if the Doosan plan can obtain a fee of $69/pp with 4,050 participants, then the Plan, with 5,627 participants at the end of 2021, should be able to obtain a fee of around $69/pp, *or lower*, as indicated by the trend line generated from the Bundled RKA Fee Rates paid by all the comparable plans.

96.     The massive disparity between the Bundled RKA fees paid by the Doosan plan and the Plan's actual effective Bundled RKA fee rate of around $96/pp, viewed holistically and in conjunction with the evidence of the fees paid by all the other comparable plans, leads to a likely reasonable inference that the Plan paid excessive and unreasonable RKA fees and the Plan's process was not prudent.

97. **Dana Retirement Savings Plan** ("Dana"): The comparable annual Bundled RKA fee rate of $42/pp is taken directly from the "Plan Administrative Expenses" section of the participant fee disclosure dated on May, 28, 2022. The section indicates "An annual plan recordkeeping fee of $42 is charged to each plan participant."

98. The Dana plan is a meaningful benchmark because at the end of 2021 the Dana plan had 4,719 participants, slightly less than the 5,627 participants in the Plan. The costs to a recordkeeper for providing RKA services to a plan with more than 3,000 participants are driven primarily by the number of participants. There are no material differences in the RKA services provided to plans as large as both the Dana plan and the Plan and any service differentials cannot explain the disparity between the fees paid by the Dana plan and the fees paid by the Plan.

99. For example, the disparity of $54/pp between the $42/pp Bundled RKA rate for the Dana plan's fee compared to the Bundled RKA rate of $96/pp paid by the Plan represents over $300,000 annually and would conservatively represent more than 6,000 hours of RKA services in one year provided by employees of the recordkeeper.

100. As a result, the primary driver of the Bundled RKA fee rate that recordkeepers would initially bid to provide RKA services is the number of participants in the plan. Therefore, all else being equal, if the Dana plan can obtain a fee of $42/pp with 4,719 participants, then the Plan, with 5,627 participants at the end of 2021, should be able to obtain a fee of around $42/pp, *or lower*, as indicated by the trend line generated from the Bundled RKA Fee Rates paid by all the comparable plans.

101. The massive disparity between the Bundled RKA fees paid by the Dana plan and the Plan's actual effective Bundled RKA fee rate of around $96/pp, viewed holistically and in conjunction with the evidence of the fees paid by all the other comparable plans, leads to a likely

reasonable inference that the Plan paid excessive and unreasonable RKA fees and the Plan's process was not prudent.

102. **Komatsu Mining Corp. Retirement Savings Plan** ("Komatsu"): The comparable annual Bundled RKA fee rate of $49/pp is taken directly from the "Plan Administrative Fees and Expenses" section of the Participant Fee Disclosure Notice produced on September 14, 2020. The section indicates the "Recordkeeping Fee" is $49 per year deducted quarterly.

103. The Komatsu plan is a meaningful benchmark because at the end of 2020 the Komatsu plan had 5,235 participants, slightly less than the 5,627 participants in the Plan. The costs to a recordkeeper for providing RKA services to a plan with more than 3,000 participants are driven primarily by the number of participants. There are no material differences in the RKA services provided to plans as large as both the Komatsu plan and the Plan and any service differentials cannot explain the disparity between the fees paid by the Komatsu plan and the fees paid by the Plan.

104. For example, the disparity of $47/pp between the $49/pp Bundled RKA rate for the Komatsu plan's fee compared to the Bundled RKA rate of $96/pp paid by the Plan represents over $260,000 annually and would conservatively represent more than 5,200 hours of RKA services in one year provided by employees of the recordkeeper.

105. As a result, the primary driver of the Bundled RKA fee rate that recordkeepers would initially bid to provide RKA services is the number of participants in the plan. Therefore, all else being equal, if the Komatsu plan can obtain a fee of $49/pp with 5,235 participants, then the Plan, with 5,627 participants at the end of 2021, should be able to obtain a fee of around $49/pp, *or lower*, as indicated by the trend line generated from the Bundled RKA Fee Rates paid by all the comparable plans.

106. The massive disparity between the Bundled RKA fees paid by the Komatsu plan and the Plan's actual effective Bundled RKA fee rate of around $96/pp, viewed holistically and in conjunction with the evidence of the fees paid by all the other comparable plans, leads to a likely reasonable inference that the Plan paid excessive and unreasonable RKA fees and the Plan's process was not prudent.

107. **Mercedes-Benz USA, Employees' Retirement Savings Program** ("MBUSA"): The comparable annual Bundled RKA fee rate of $52/pp is taken directly from the Disclosure of Plan-Related Information dated November 2019. The document indicates the "the annual charge is $52 for each participant with an account balance."

108. The MBUSA plan is a meaningful benchmark because at the end of 2019 the MBUSA plan had 5,659 participants, almost identical to the 5,627 participants in the Plan. The costs to a recordkeeper for providing RKA services to a plan with more than 3,000 participants are driven primarily by the number of participants. There are no material differences in the RKA services provided to plans as large as both the MBUSA plan and the Plan and any service differentials cannot explain the disparity between the fees paid by the MBUSA plan and the fees paid by the Plan.

109. For example, the disparity of $44/pp between the $52/pp bundled RKA rate for the MBUSA plan's fee compared to the bundled RKA rate of $96/pp paid by the Plan represents over $240,000 annually and would conservatively represent more than 4,800 hours of RKA services in one year provided by employees of the recordkeeper.

110. As a result, the primary driver of the Bundled RKA fee rate that recordkeepers would initially bid to provide RKA services is the number of participants in the plan. Therefore, all else being equal, if the MBUSA plan can obtain a fee of $52/pp with 5,659 participants, then

the Plan, with 5,627 participants at the end of 2021, should be able to obtain a fee of around $52/pp. The fact that the Plan had around 32 fewer participants than the MBUSA plan does not make the MBUSA plan a meaningless comparable plan.

111. The massive disparity between the Bundled RKA fees paid by the MBUSA plan and the Plan's actual effective Bundled RKA fee rate of around $96/pp, viewed holistically and in conjunction with the evidence of the fees paid by all the other comparable plans, leads to a likely reasonable inference that the Plan paid excessive and unreasonable RKA fees and the Plan's process was not prudent.

112. **Bunzl USA, LLC Deferred Savings Plan** ("Bunzl"): The comparable annual Bundled RKA fee rate of $48/pp is taken directly from the "Participant Accounts" section of the Financial Statement attached to the 2021 Form 5500. The section indicates the plan's most recent fee is now "$48 per participant per year after the first year of employment."

113. The Bunzl plan is a meaningful benchmark because at the end of 2019 the Bunzl plan had 6,657 participants, slightly more than the 5,627 participants in the Plan. The costs to a recordkeeper for providing RKA services to a plan with more than 3,000 participants are driven primarily by the number of participants. There are no material differences in the RKA services provided to plans as large as both the Bunzl plan and the Plan and any service differentials cannot explain the disparity between the fees paid by the Bunzl plan and the fees paid by the Plan.

114. For example, the disparity of $48/pp between the $48/pp Bundled RKA rate for the Bunzl plan's fee compared to the Bundled RKA rate of $96/pp paid by the Plan represents over $270,000 annually and would conservatively represent more than 5,400 hours of RKA services in one year provided by employees of the recordkeeper.

115.     As a result, the primary driver of the Bundled RKA fee rate that recordkeepers would initially bid to provide RKA services is the number of participants in the plan. Therefore, all else being equal, if the Bunzl plan can obtain a fee of $48/pp with 6,657 participants, then the Plan, with 5,627 participants at the end of 2021, should be able to obtain a fee of around $48/pp.

116.     The massive disparity between the Bundled RKA fees paid by the Bunzl plan and the Plan's actual effective Bundled RKA fee rate of around $96/pp, viewed holistically and in conjunction with the evidence of the fees paid by all the other comparable plans, leads to a likely reasonable inference that the Plan paid excessive and unreasonable RKA fees and the Plan's process was not prudent.

117.     **Kirkland & Ellis LLP Defined Contribution 401(k) Savings Plan** ("KirklandEllis"): The comparable annual Bundled RKA fee rate of $46/pp is taken directly from the participant change notice effective on August 15, 2022.  The document indicates "If you are a Partner or no longer work for Kirkland & Ellis, you will be charged $46 ($11.50 per quarter)."

118.     The KirklandEllis plan is a meaningful benchmark because at the end of 2021 the KirklandEllis plan had 7,248 participants, slightly more than the 5,627 participants in the Plan. The costs to a recordkeeper for providing RKA services to a plan with more than 3,000 participants are driven primarily by the number of participants. There are no material differences in the RKA services provided to plans as large as both the KirklandEllis plan and the Plan and any service differentials cannot explain the disparity between the fees paid by the KirklandEllis plan and the fees paid by the Plan.

119.     For example, the disparity of $50/pp between the $46/pp Bundled RKA rate for the KirklandEllis plan's fee compared to the Bundled RKA rate of $96/pp paid by the Plan represents

over $280,000 annually and would conservatively represent more than 5,600 hours of RKA services in one year provided by employees of the recordkeeper.

120. As a result, the primary driver of the Bundled RKA fee rate that recordkeepers would initially bid to provide RKA services is the number of participants in the plan. Therefore, all else being equal, if the KirklandEllis plan can obtain a fee of $46/pp with 7,248 participants, then the Plan, with 5,627 participants at the end of 2021, should be able to obtain a fee of around $46/pp. The fact that the Plan had around 1,621 fewer participants than the KirklandEllis plan does not make the KirklandEllis plan a meaningless comparable plan.

121. The massive disparity between the Bundled RKA fees paid by the KirklandEllis plan and the Plan's actual effective Bundled RKA fee rate of around $96/pp, viewed holistically and in conjunction with the evidence of the fees paid by all the other comparable plans, leads to a likely reasonable inference that the Plan paid excessive and unreasonable RKA fees and the Plan's process was not prudent

122. Each of these comparator plans note in their fee disclosures that they received Bundled RKA services just like the NAL 401(k) Plan in the form of recordkeeping, participant communications, and other administrative services.

123. From the years 2018 through 2022, the graph below illustrates the annual Bundled RKA fees paid by other comparable plans of similar sizes, receiving a materially similar level and quality of services, compared to the average Bundled RKA fees paid by the NAL 401(k) Plan (as identified in the table above), with the white data points representing Bundled RKA fees that recordkeepers offered to (and were accepted by) comparable plans.



124.    The trend line (dashed white in the graph above) generated from these data points represent a reasonable estimate of the fee rate that several recordkeepers, including Principal itself, serving plans of a similar size would be willing to accept in a competitive environment to provide Bundled RKA services to the NAL 401(k) Plan.

125.    From the years 2018 to 2022, the table and graph above illustrate that the Plan paid an effective average annual Bundled RKA fee of $96 per participant.

126.    A reasonable Bundled RKA fee for the NAL 401(k) Plan based on the services provided by existing recordkeepers and the Plan's features, based on graph and charts above, would have been $52 per participant.

127.    Thus, the Bundled RKA fees paid by the NAL 401(k) Plan to Principal during the Class Period were excessive relative to the RKA services rendered. More specifically, a disparity of $44 per participant (over 85% premium) existed during the relevant time period.

128. From the years 2018 through 2022 and based upon information derived from 404(a)(5) participant fee disclosure documents provided to participants in similarly sized plans, had Defendants been acting prudently, the Plan actually would have paid significantly less than an average of approximately $554,784 per year in Bundled RKA fees, which equated to an effective average of approximately $96 per participant per year.

129. From the years 2018 through 2022 and based upon information derived from the 404(a)(5) participant fee disclosure documents provided to participants in similarly sized plans, as compared to other Plans of similar sizes receiving a materially identical level and quality of Bundled RKA services, had Defendants been acting prudently, the Plan actually would have paid on average a reasonable effective annual market rate for Bundled RKA of approximately $300,508 per year, which equates to approximately $52 per participant per year.

130. During the entirety of the Class Period, a hypothetical prudent plan fiduciary would not agree to pay *over an 85% premium* for what they could otherwise pay for the materially similar level and quality of Bundled RKA services.

131. From the years 2018 through 2022 and based upon information derived from 404(a)(5) participant fee disclosures, the Plan additionally cost its participants on average approximately $254,276 per year in unreasonable and excessive Bundle RKA fees, which equates to, on average, approximately $44 per participant per year.

132. From the years 2018 to 2022, and because Defendants did not act with prudence, and as compared to other plans of similar sizes and with a materially similar level and quality of services, the NAL 401(k) Plan actually cost its participants a total minimum amount of approximately $1,271,380 in unreasonable and excessive Bundled RK&A fees.

133.   From the years 2018 to 2022, based upon information derived from 404(a)(5) participant fee disclosures, because Defendants did not act prudently, and as compared to other Plans of similar sizes and with a materially similar level and quality of services, the NAL 401(k) Plan caused Plan participants to suffer losses (when accounting for compounding percentages) a total cumulative amount in excess of $1,597,262 in Bundled RKA fees.

134.   Defendants could have received Bundled RKA services during the Class Period of similar level and quality from Principal or other recordkeepers that provide Bundled RKA services to similarly-sized plans, like the NAL plan, because the NAL 401(k) Plan fee disclosures establish that the Plan received no services that were materially different than the services received by all comparable plans.

135.   Defendants failed to take advantage of the Plan's enormous size to timely negotiate lower fees from its existing recordkeeper, Principal, and Defendants could have obtained materially similar Bundled RKA services for less from other recordkeepers or from Principal itself if had only used it massive size and leverage.

136.   Defendants did not conduct effective, competitive bidding for Bundled RKA services, and failed to use the NAL 401(k) Plan's massive size to negotiate rebates from Principal.

137.   Plaintiff has participated in several other very large 401(k) plans from other employers and there have been no material differences in the services that he has received.

138.   During the entirety of the Class Period, and had Defendants engaged in regular and/or reasonable examination and competitive comparison of the Bundled RKA fees it paid to Principal, it would have realized that the Plan was compensating Principal unreasonably and inappropriately for its size and scale, passing these objectively unreasonable and excessive fee burdens

to Plaintiff and Plan participants, and therefore should have removed Principal as NAL 401(k) Plan's recordkeeper.

139. During the entirety of the Class Period and by failing to recognize that the NAL 401(k) Plan and its participants were being charged much higher Bundled RKA fees than they should have been and/or by failing to take effective remedial actions including removing Principal as the Plan recordkeeper, Defendants breached their fiduciary duty of prudence to Plaintiff and Plan participants, causing millions of dollars of harm to Plaintiff and Class Member's retirement accounts.

## NAL'S NICOTINE SURCHARGE VIOLATES ERISA'S ANTI-DISCRIMINATION RULE

140. For NAL employees to maintain health insurance coverage under the NAL Health Plan, they must declare whether they use nicotine products. Those who do use nicotine products are required to pay an additional fee of $780 per year ($65 per month) —hereafter referred to a "nicotine surcharge"—to maintain coverage, and additionally, there are charges for spousal nicotine use.

141. As a baseline rule, and to broaden access to affordable health insurance coverage, the Patient Protection and Affordable Care Act (ACA) amended ERISA to prohibit any health insurer or medical plan from discriminating against any participant in providing coverage or charging premiums based on a "health status-related factor," including the use of tobacco.

142. Pursuant to this rule, a plan "may not require any individual (as a condition of enrollment or continued enrollment under the plan) to pay a premium or contribution which is greater than such premium or contribution for a similarly situated individual enrolled in the plan on the basis of any health status-related factor in relation to the individual or to an individual enrolled under the plan as a dependent of the individual." 29 U.S.C. § 1182(b)(1); 42 U.S.C. §

300gg-4(b)(1).

143. On its face, NAL Health Plan's nicotine surcharge violates this provision. Plaintiff and all others similarly situated were required to pay *at least* an additional "premium or contribution" of $780 per year ($65 per month), which may be more if an employee has a spouse who used nicotine, based on the "health status-related factor" of using nicotine products.

144. At all times relevant to this lawsuit, pursuant to NAL's Health Plan, any employee who used any nicotine products, including cigarettes, within twelve months preceding enrollment in the plan were required to declare themselves to be nicotine users during the annual enrollment process.

145. If NAL employees or their spouses enrolled in a smoking cessation program, they should have been eligible to have the Tobacco Surcharge removed entirely upon completion of the smoking cessation program, but there is no indication in NAL Health Plan documents or employee pay-stubs that this what actually occurred.

146. In order to satisfy the requirement to provide a "reasonable alternative standard," the same, *full reward* must be available under the wellness program to individuals who qualify by satisfying a reasonable alternative standard (*i.e.*, completing the tobacco use cessation program) as is provided to individuals who qualify by satisfying the program's otherwise applicable standard (*i.e.*, not a tobacco user).

147. NAL employees admitting nicotine use had to enroll in a tobacco cessation program to lower their medical deduction of $65/month for themselves and an additional amount for their spouses who use tobacco.

148. Payment of the $780 per year nicotine surcharge was required for Plaintiff and all others similarly situated to remain insured under the NAL Health Plan.

149.     Plaintiff and all others similarly situated have in fact paid these nicotine surcharges during the Class Period.

150.     NAL is, and has been, required to make contributions to the NAL Health Plan to ensure that it remains adequately funded.

151.     By collecting the nicotine surcharge, NAL has reduced the amount of its own contributions to the NAL Health Plan, thereby increasing the company's profits.

152.     At all times relevant to this lawsuit, NAL has maintained sole control of the nicotine surcharge program, including by determining which plan participants are required to pay the surcharge, withholding participants' funds from their paychecks to pay the surcharge, and determining which employees are reimbursed for the tobacco surcharge

## NAL DOES NOT QUALIFY FOR WELLNESS PROGRAM SAFE HARBOR

153.     As an exception to its anti-discrimination rule, ERISA carves out protection for "programs of health promotion and disease prevention," also known as "wellness pro-grams." 29 U.S.C. § 1182(b)(2)(B); 42 U.S.C. § 300gg-4(b)(2)(B).

154.     But to qualify as a lawful wellness program, a plan must fully comply with a set of statutory and regulatory requirements.

155.     Those requirements concern (1) the frequency of the opportunity for a participant to qualify for the reward; (2) the size of the reward; (3) reasonable design of the program; (4) uniform availability and reasonable alternative standards; and (5) notice of the availability of a reasonable alternative standard. 29 C.F.R. § 2590.702(f).

156.     These regulations "set forth criteria for an *affirmative defense* that can be used by plans and issuers in response to a claim that the plan or issuer discriminated under the [] nondiscrimination provisions." *Incentives for Nondiscriminatory Wellness Programs in*

*Group Health Plans*, 78 Fed. Reg. 33158 at 33160 (June 3, 2013) (emphasis added).

157.     Every one of the requirements "must be satisfied in order for the plan or issuer to qualify for an exception to the prohibition on discrimination based on health status." *Id.*

158.     NAL's nicotine surcharge program did not, and does not, satisfy the requirements that it provide a reasonable alternative standard, or that it provide notice of a reasonable alternative standard.

159.     As a result, NAL cannot meet each element of its affirmative defense.

160.     Consequently, NAL is not entitled to safe harbor protection for operating a compliant wellness program and its assessment of its nicotine surcharge constitutes unlawful discrimination based on a health status-related factor.

## NAL'S NICOTINE SURCHARGE PROGRAM DID NOT PROVIDE REASONABLE ALTERNATIVE STANDARD

161.     By law, a nicotine surcharge is an example of an "outcome-based" and "health contingent" wellness program. 78 Fed. Reg. 33158 at 33161 ("An outcome- based wellness program is a type of health-contingent wellness program that requires an individual to attain or maintain a specific health outcome (such as not smoking) in order to obtain a reward."); *see also id*. at 33159 ("Examples of health-contingent wellness programs in the proposed regulations included a program that imposes a premium surcharge based on tobacco use.").

162.     To be lawful, such a program must provide for "[u]niform availability and reasonable alternative standards." 29 C.F.R. § 2590.702(f)(4)(iv).

163.     "[A] reasonable alternative standard must be provided to all individuals who do not meet the initial standard, to ensure that the program is reasonably designed to improve health and is not a subterfuge for underwriting or reducing benefits based on health status." 78 Fed. Reg.

33158 at 33160.

164.    A common means by which plan administrators attempt to provide reasonable alternative standard to a tobacco surcharge is to permit participants to avoid the surcharge by attending a smoking cessation program.

165.    That is the method NAL has attempted to implement.

166.    That being said, the NAL Health Plan documents are unclear whether Plan participants can eliminate the surcharge by attending a qualified smoking cessation program.

167.    For an alternative standard (such as attending a smoking cessation program) to be deemed "reasonable" under the law, "[t]he full reward under the outcome-based wellness program must be available to all similarly situated individuals." 29 C.F.R. § 2590.702(f)(4)(iv).

168.    Thus, a participant who meets the alternative standard must be eligible to avoid the surcharge *in its entirety* for a given plan year.

169.    The applicable regulatory guidelines state that "while an individual may take some time to request, establish, and satisfy a reasonable alternative standard, the same, full reward must be provided to that individual as is provided to individuals who meet the initial standard for that plan year. (For example, if a calendar year plan offers a health-contingent wellness program with a premium discount and an individual who qualifies for a reasonable alternative standard satisfies that alternative on April 1, *the plan or issuer must provide the premium discounts for January, February, and March to that individual*.)".

170.    Plans and issuers have flexibility to determine how to provide the portion of the reward corresponding to the period before an alternative was satisfied (e.g., payment for the retroactive period or pro rata over the remainder of the year) as long as the method is reasonable and

the *individual receives the full amount of the reward.*" 78 Fed. Reg. 33158 at 33163 (emphasis added).

171.    But a NAL employee who completed the alternative standard during a given plan year is not be eligible to avoid the entire $780 nicotine surcharge.

172.    If employees enrolled in a smoking cessation program, they should be eligible to have the *entire* tobacco surcharge removed upon completion of the smoking cessation program, but there is no indication in NAL Health Plan documents or participant health care materials that this is what happens.

173.    Because a plan participant cannot avoid the nicotine surcharge in its entirety, NAL's alternative standard does not permit participants to receive the "full reward" and is therefore not a "reasonable alternative standard" under the safe harbor for wellness programs.

## NAL FAILED TO PROVIDE NOTICE OF AVAILABILITY OF A REASONABLE ALTERNATIVE STANDARD

174.    Additionally, to be deemed a lawful wellness program, "[t]he plan or issuer must disclose *in all plan materials describing the terms of an outcome-based wellness program . . .* the availability of a reasonable alternative standard to qualify for the reward." 29 C.F.R. § 2590.702 (emphasis added); 42 U.S.C. § 300gg-4(j)(3)(E).

175.    "[A] plan disclosure that references a premium differential based on tobacco use . . . must include this disclosure. 78 Fed. Reg. 33158-01 at 33166.

176.    Multiple NAL Health Plan documents discussing the nicotine surcharge do not disclose the existence of a reasonable alternative standard by which it can be avoided.

177.    For instance, NAL Health Plan's Benefits Booklet (effective January 1, 2024), provided to employees, discusses the definition of "Tobacco User" (p. 36) and "Tobacco use screening and cessation interventions for tobacco users" as part of preventive care services for

adults (p. 83), but provides no notice of the actual reasonable alternative standard, how to utilize the standard, or the relationship between the reasonable alternative standard and qualification for the reward (i.e., repayment of surcharge).

178.     Though the materials appear to suggest that a participant may enroll in a smoking cessation program, they do not disclose that such a program is a reasonable alternative standard by which a participant may qualify for the award (that is, avoid the surcharge).

179.     NAL has not complied with the requirement that it provide notice of the availability of a reasonable alternative standard by which a plan participant could avoid the nicotine surcharge and therefore receive the full reward.

180.     NAL does not qualify for the safe harbors for outcome-based wellness programs involving tobacco use and thus, is in violation of ERISA's discrimination provisions involving health-related factors.

181.     These violation of ERISA's anti-discrimination rules based on health-status factors has cost Plaintiff and the Class millions of dollars in additional and unreasonable health care premiums.

## CLASS ACTION ALLEGATIONS

### 401(K) CLASS

182.     29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to enforce a breaching fiduciary's liability to the Plan under 29 U.S.C. § 1109(a).

183.     In acting in his representative capacity for the NAL 401(k) Plan, Plaintiff seeks to certify this action as a class action on behalf of all participants and beneficiaries of the NAL 401(k) Plan. Plaintiff seek to certify, and to be appointed as representative of, the following 401(k) Class:

All participants and beneficiaries of the North American Lighting, Inc. Command Plus Plan (excluding the Defendants or any participant/beneficiary who is a fiduciary to the Plan) beginning April 10, 2018, and running through the date of judgment.

184.    The 401(k) Class includes approximately 5,700 members and is so large that joinder of all its members is impracticable, pursuant to Federal Rule of Civil Procedure 23(a)(1).

185.    There are questions of law and fact common to this 401(k) Class pursuant to Federal Rule of Civil Procedure 23(a)(2), because Defendants owed fiduciary duties to the NAL 401(k) Plan and took the actions and omissions alleged as the Plan and not as to any individual participant. Common questions of law and fact include but are not limited to the following:

    a.    Whether Defendants are fiduciaries liable for the remedies provided by 29 U.S.C. § 1109(a);

    b.    Whether Defendants breached their fiduciary duties to the Plan;

    c.    What are the losses to the Plan resulting from each breach of fiduciary duty; and

    d.    What Plan-wide equitable and other relief the Court should impose in light of Defendants' breach of fiduciary duty.

186.    Plaintiff's claims are typical of the claims of the Class pursuant to Federal Rule of Civil Procedure 23(a)(3), because Plaintiff was a participant during the time period at issue and all participants in the Plan were harmed by Defendants' misconduct.

187.    Plaintiff will adequately represent the Class pursuant to Federal Rule of Civil Procedure 23(a)(4), because he was a participant in the Plan during the Class period, has no interest that conflicts with the Class, is committed to the vigorous representation of the Class, and has engaged experienced and competent lawyers to represent the Class.

188.    Certification is appropriate under Federal Rule of Civil Procedure 23(b)(1), because prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (1) inconsistent or varying adjudications that would establish

incompatible standards of conduct for Defendant concerning its discharge of fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. § 1109(a), and (2) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries who are not parties to the adjudication, or would substantially impair those participants' and beneficiaries' ability to protect their interests.

189.    Certification is also appropriate under Federal Rule of Civil Procedure 23(b)(2) because Defendants have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

190.    Plaintiff's attorneys have substantial and varied experience in complex ERISA and class action litigation and will adequately represent the Class.

191.    The claims brought by the Plaintiff arise from fiduciary breaches as to the Plan in its entirety and does not involve mismanagement of individual accounts.

192.    The claims asserted on behalf of the Plans in this case fall outside the scope of any exhaustion language in the individual participants' Plan.

193.    Exhaustion is intended to serve as an administrative procedure for participants and beneficiaries whose claims have been denied and not where a participant or beneficiary brings suit on behalf of a Plan for breaches of fiduciary duty.

194.    Under ERISA, an individual "participant" or "beneficiary" is distinct from an ERISA Plan. A participant's obligation – such as a requirement to exhaust administrative remedies – does not, by itself, bind the Plan.

195.    Moreover, any administrative appeal would be futile because the entity hearing the appeal (the Plan Administrator) is the same Plan Administrator that made the decisions that are at issue in this lawsuit. Policy supporting exhaustion of administrative remedies in certain circumstances – that the Court should review and where appropriate defer to a Plan administrator's decision – does not exist here because courts will not defer to Plan administrator's legal analysis and interpretation.

**SURCHARGE CLASS**

196.    29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to enforce a breaching fiduciary's liability to the Plan under 29 U.S.C. § 1109(a).

197.    In acting in this representative capacity, Plaintiff seeks to certify this action as a class action on behalf of all participants and beneficiaries of the NAL Health Plan. Plaintiff seeks to certify, and to be appointed as representatives of, the following Class:

> All persons in the United States who paid North American Lighting, Inc.'s tobacco surcharge in connection with the North American Lighting, Inc. Group Health and Insurance Plan (excluding the Defendants or any participant/beneficiary who is a fiduciary to the Plan) beginning April 10, 2018, and running through the date of judgment.

198.    The Class includes thousands of members and is so large that joinder of all its members is impracticable, pursuant to Federal Rule of Civil Procedure 23(a)(1).

199.    There are questions of law and fact common to this Class pursuant to Federal Rule of Civil Procedure 23(a)(2), because Defendants owed fiduciary duties to the Plan and took the actions and omissions alleged as the Plan and not as to any individual participant.  Common questions of law and fact include but are not limited to the following:

a. Whether NAL's nicotine surcharge discriminates against plan participants based on a health status-related factor;

b. Whether NAL's nicotine surcharge program qualifies for statutory safe harbor protection as a compliant wellness program;

c. Whether NAL's can meet every element of its statutory affirmative defense for operating a compliant wellness program;

d. Whether NAL's smoking cessation program constitutes a reasonable alternative standard by which a participant could receive the full reward of the nicotine surcharge program;

e. Whether enrollment in the smoking cessation program would allow a participant to be fully reimbursed for surcharge payments previously made in a given plan year;

f. Whether all of NAL Health Plan's materials describing the nicotine surcharge give notice of a reasonable alternative standard by which a plan participant may receive the full reward;

g. Whether NAL breached its fiduciary duties with respect to its collection and retention of the nicotine surcharge;

h. What are the losses to the Plan resulting from each breach of fiduciary duty; and

i. What Plan-wide equitable and other relief the Court should impose in light of Defendants' breach of fiduciary duty.

200. Plaintiff's claims are typical of the claims of the pertinent class pursuant to Federal Rule of Civil Procedure 23(a)(3), because all class claims arise from the same course of conduct

by NAL – its collection of an unlawful nicotine surcharge – and are based on the same legal theories.

201.   Plaintiff will adequately represent the Class pursuant to Federal Rule of Civil Procedure 23(a)(4), because he was a participant in the NAL Health Plan who was charged the nicotine surcharge during the Class period, has no interests that conflict with the Class, is committed to the vigorous representation of the Class, and has engaged experienced and competent lawyers to represent the Class.

202.   Certification is appropriate under Federal Rule of Civil Procedure 23(b)(1), because prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (1) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendant concerning its discharge of fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. § 1109(a), and (2) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries who are not parties to the adjudication, or would substantially impair those participants' and beneficiaries' ability to protect their interests.

203.   Certification is also appropriate under Federal Rule of Civil Procedure 23(b)(2) because Defendants have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

204.   Plaintiff's attorneys have substantial and varied experience in complex ERISA and class action litigation and will adequately represent the Class.

205. The claims brought by the Plaintiff arise from fiduciary breaches as to the Plan in its entirety and does not involve mismanagement of individual accounts.

206. The claims asserted on behalf of the Plans in this case fall outside the scope of any exhaustion language in the individual participants' Plan. Exhaustion is intended to serve as an administrative procedure for participants and beneficiaries whose claims have been denied and not where a participant or beneficiary brings suit on behalf of a Plan for breaches of fiduciary duty.

207. Under ERISA, an individual "participant" or "beneficiary" is distinct from an ERISA Plan. A participant's obligation – such as a requirement to exhaust administrative remedies – does not, by itself, bind the Plan.

208. Moreover, any administrative appeal would be futile because the entity hearing the appeal (the Plan Administrator) is the same Plan Administrator that made the decisions that are at issue in this lawsuit. Policy supporting exhaustion of administrative remedies in certain circumstances – that the Court should review and where appropriate defer to a Plan administrator's decision – does not exist here because courts will not defer to Plan administrator's legal analysis and interpretation

### FIRST CLAIM FOR RELIEF
**Breach of Duty of Prudence of ERISA, as Amended**
**(Plaintiff, on behalf of himself and Class, Against Administrative**
**Committee of NAL 401(k) Plan – Bundled RKA Fees)**

209. Plaintiff restates the above allegations as if fully set forth herein.

210. Defendant Administrative Committee of the NAL 401(k) Plan is a fiduciary of the NAL 401(k) Plan under 29 U.S.C. §§ 1002(21) and/or 1102(a)(1).

211. 29 U.S.C. § 1104(a)(1)(B) imposes a fiduciary duty of prudence upon Defendant Administrative Committee of the NAL 401(k) Plan in its administration of the NAL 401(k) Plan.

212.     Defendant Administrative Committee of the NAL 401(k) Plan, as a fiduciary of the NAL 401(k) Plan, is responsible for selecting a recordkeeper that charges objectively reasonable Bundled RKA fees.

213.     During the Class Period, Defendant Administrative Committee of the NAL 401(k) Plan had a fiduciary duty to do all of the following: ensure that the NAL 401(k) Plan's Bundled RKA fees were objectively reasonable; defray reasonable expenses of administering the Plan; and act with the care, skill, diligence, and prudence required by ERISA.

214.     During the Class Period, Defendant Administrative Committee of the NAL 401(k) Plan breached their fiduciary duty of prudence to NAL 401(k) Plan participants, including to Plaintiff, by failing to: ensure that the Plan's Bundled RKA fees were objectively reasonable, defray reasonable expenses of administering the Plan, and act with the care, skill, diligence, and prudence required by ERISA.

215.     During the Class Period, Defendant Administrative Committee of the NAL 401(k) Plan further had a continuing duty to regularly monitor and evaluate the NAL 401(k) Plan's recordkeeper, Principal, to make sure it was providing the Bundled RKA services at reasonable costs, given the highly competitive, commodified market surrounding recordkeeping and the enormous bargaining power the Plan had to negotiate the best fees, and remove the recordkeeper if it provided recordkeeping services at objectively unreasonable levels.

216.     During the Class Period, Defendant Administrative Committee of the NAL 401(k) Plan breached their duty to Plan participants, including to Plaintiff, by failing to employ a prudent process and by failing to evaluate the cost of the NAL 401(k) Plan's recordkeeper critically or objectively in comparison to other recordkeeper options.

217.     Defendant Administrative Committee of the NAL 401(k) Plan's failure to discharge their duties with respect to the NAL 401(k) Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, breaching its duties under 29 U.S.C. § 1104(a)(1)(B).

218.     As a result of Defendant Administrative Committee of the NAL 401(k) Plan's breach of fiduciary duty of prudence with respect to the NAL 401(k) Plan, the Plaintiff and Plan participants suffered millions of dollars in objectively unreasonable and unnecessary monetary losses.

219.     Defendant Administrative Committee of the NAL 401(k) Plan are liable under 29 U.S.C. §§ 1109(a) and 1132(a)(2) to make good to the NAL 401(k) Plan the losses resulting from the breaches, to restore to the Plan any profits Defendants made through the use of Plan assets, and to restore to the Plan any profits resulting from the breaches of fiduciary duties alleged in this Count. In addition, Defendant Administrative Committee of the NAL 401(k) Plan is subject to other equitable relief as set forth in the Prayer for Relief.

## SECOND CLAIM FOR RELIEF
**Failure to Adequately Monitor Other Fiduciaries under ERISA, as Amended**
**(Plaintiff, on behalf of himself and Class, Against Defendants**
**NAL and Board – Bundled RKA Fees)**

220.     Plaintiff restates the above allegations as if fully set forth herein.

221.     Defendants NAL and Board had the authority to appoint and remove members or individuals responsible for Plan Bundled RKA fees on the Administrative Committee of the NAL 401(k) Plan and knew or should have known that these fiduciaries had critical responsibilities for the Plan.

222.     In light of this authority, Defendants NAL and Board had a duty to monitor those individuals responsible for Plan Bundled RKA fees on the Administrative Committee of the NAL 401(k) Plan to ensure that they were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the NAL 401(k) Plan in the event that these individuals were not fulfilling those duties.

223.     Defendants NAL and Board had a duty to ensure that the individuals responsible for Plan Bundled RKA fees possessed the needed qualifications and experience to carry out their duties (or use qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the NAL 401(k) Plan's Bundled RKA fees; and reported regularly to Defendant NAL and Board.

224.     The objectively unreasonable and excessive Bundled RKA fees paid by the Plan inferentially establish that Defendants NAL and Board breached their duty to monitor by, among other things:

     a.     Failing to monitor and evaluate the performance of individuals responsible for Plan Bundled RKA fees on the Administrative Committee of the NAL 401(k) Plan or have a system in place for doing so, standing idly by as the NAL 401(k) Plan suffered significant losses in the form of objectively unreasonably Bundled RKA expenses;

     b.     Failing to monitor the process by which the Plan's recordkeeper, Principal, was evaluated and failing to investigate the availability of more reasonably-priced recordkeepers; and

     c.     Failing to remove individuals responsible for Plan Bundled RKA fees on the Administrative Committee of the NAL 401(k) Plan whose performance was inadequate in that these individuals continued to pay the same Bundled RKA costs even though solicitation of competitive bids would have shown that maintaining Principal as the recordkeeper at the contracted price was imprudent, excessively

costly, all to the detriment of the Plaintiff and other Plan partici-
pants' retirement savings.

225.     As the consequences of the breaches of the duty to monitor for Bundled RKA fees

the Plaintiff and Plan participants suffered millions of dollars of objectively unreasonable and un-

necessary monetary losses.

226.     Pursuant to 29 U.S.C. §§1109(a) and 1132(a)(2), Defendants NAL and Board are

liable to restore to the NAL 401(k) Plan all losses caused by their failure to adequately monitor

individuals responsible for Plan RKA fees on the Administrative Committee of the NAL 401(k)

Plan. In addition, Plaintiff are entitled to equitable relief and other appropriate relief as set forth in

the Prayer for Relief.

### THIRD CLAIM FOR RELIEF
### ERISA Statutory Violation Under Section 502(a)(3)
### Unlawful Surcharge - Failure to Provide a Reasonable Alternative Standard

227.     Plaintiff restates the above allegations as if fully set forth herein.

228.     To enroll in the NAL Health Plan, Plaintiff and class members who used nicotine

were required to pay a tobacco surcharge in the amount of $780 per year.

229.     NAL's tobacco surcharge is not and was not a permissible wellness program, be-

cause it did not provide for a reasonable alternative standard, in that:

a.  The NAL Health Plan did not provide for a participant an alternative means to

avoid the nicotine surcharge by enrolling in a smoking cessation program; and

b.  Even if participant did complete an alternative standard during a given plan year,

that employee would not be eligible to receive the "full reward" of the tobacco surcharge

program, that being a $780 reduction in premium costs to maintain medical coverage.

230. NAL cannot meet every element of its affirmative defense for operating a lawful, compliant wellness program, and is therefore not entitled to statutory safe harbor protection.

231. NAL's nicotine surcharge has discriminated against, and continues to discriminate against, NAL Health Plan participants based on a health status-related factor and it is assessing premiums or contributions, in violation of 29 U.S.C. § 1182(b).

232. 29 U.S.C. § 1182(b) is a provision of ERISA that Plaintiff and class members may enforce pursuant to 29 U.S.C. § 1132(a)(3).

233. Plaintiff and class members were required to pay an illegal fee, and NAL collected that fee from them in violation of the law. Equity requires that those funds be returned.

## FOURTH CLAIM FOR RELIEF
### ERISA Statutory Violation Under Section 502(a)(3) –
### Unlawful Surcharge - Failure to Give Required Notice

234. Plaintiff restates the above allegations as if fully set forth herein.

235. To enroll in the NAL Health Plan, Plaintiff and class members were required to pay a tobacco surcharge in the amount of $780 per year.

236. NAL's tobacco surcharge is not and was not a permissible wellness program, because NAL did not give statutorily required notice of reasonable alternative standard.

237. NAL Health Plan materials, including the Plan Benefits Booklet, described an apparent tobacco surcharge program without providing adequate notice of reasonable alternative standards by which the surcharge could be avoided.

238. Because NAL cannot meet every element of its affirmative defense for operating a lawful, compliant wellness program, it is not entitled to statutory safe harbor protection.

239.    NAL's tobacco surcharge has discriminated against, and continues to discriminate against, NAL Health Plan participants who smoke based on a health status-related factor and it is assessing premiums or contributions, in violation of 29 U.S.C. § 1182(b).

240.    29 U.S.C. § 1182(b) is a provision of ERISA that Plaintiff and class members may enforce pursuant to 29 U.S.C. § 1132(a)(3).

241.    Plaintiff and Class Members were required to pay an illegal fee, and NAL collected that fee from them in violation of the law. Equity requires that those funds be returned.

**FIFTH CLAIM FOR RELIEF**
**ERISA Breach of Fiduciary Duty Under ERISA Section 502(a)(2)**
**Unlawful Surcharge Violation – On Behalf of NAL Health Plan**

242.    Plaintiff restates the above allegations as if fully set forth herein.

243.    At all times relevant to this lawsuit, NAL was the administrator of the NAL Health Plan within the meaning of 29 U.S.C. § 1002(16) and was a fiduciary within the meaning of 29 U.S.C. § 1002(21)(A), in that it exercised discretionary authority and discretionary control respecting management of the NAL Health Plan and disposition of its assets by holding in trust the funds collected from the tobacco surcharge, and had discretionary authority and discretionary responsibility in the administration of the NAL Health Plan.

244.    Plaintiff and the Class are authorized to bring this fiduciary breach claim on behalf of the NAL Health Plan pursuant to 29 U.S.C. § 1132(a)(2).

245.    NAL breached its fiduciary duty by assessing and collecting the nicotine surcharge in violation of the law and in violation of the terms of the plan, as the receipt of additional funds reduced its own costs associated with funding the plan and forestalled its own obligations to make contributions to the NAL Health Plan.

246. Upon information and belief, NAL's responsibility with respect to the funding of the NAL Health Plan's claims and administrative expenses relating to the Plan's self-funded arrangements equaled the amount by which the Plan's claims and administrative expenses exceeded all participant contributions, including the tobacco surcharge funds.

247. NAL's collection of the nicotine surcharge diminished the amount NAL had to contribute to the NAL Health Plan, thereby benefiting NAL and harming the Plan.

248. As a result of the imposition of the tobacco surcharge, NAL enriched itself at the expense of the NAL Health Plan, thereby receiving a windfall.

249. NAL breached its fiduciary duties under ERISA in that it:

a. Failed to act solely in the interest of the participants and beneficiaries of the NAL Health Plan and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of plan administration, in violation of ERISA. *See* 29 U.S.C. § 1104(a)(1)(A);

b. Failed to discharge its duties in accordance with the documents and instruments governing the NAL Health Plan insofar as the documents and instruments are consistent with ERISA, in violation of ERISA. *See* 29 U.S.C. § 1104(a)(1)(D); and

c. Caused the NAL Health Plan to require participants to pay a premium of contribution which was greater than such premium or contribution for a similarly situated participant enrolled in the health plan on the basis of a health status-related factor in relation to the participant or to an individual enrolled under the health plan as a spouse of the individual, in violation of ERISA. *See* 29 U.S.C. § 1182(b).

250. As a result of these breaches, and pursuant to 29 U.S.C. § 1109, NAL is liable to make good to the NAL Health Plan all losses to the Plan resulting from its breaches, disgorge all unjust

enrichment and ill-gotten profits, and to restore to the NAL Health Plan and/or a constructive trust all profits it acquired through its violations alleged herein and which it made through use of assets of the Plan, and for such other equitable or remedial relief as is proper.

WHEREFORE, Plaintiff prays that judgment be entered against Defendants on all claims and requests that the Court award the following relief:

A.  A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative Rule 23(b)(2), of the Federal Rules of Civil Procedure;

B.  Designation of Plaintiff as Class Representative and designation of Plaintiff' counsel as Class Counsel;

C.  A Declaration the Defendants have breached their fiduciary duties under ERISA;

D.  An Order requiring NAL to reimburse all NAL Health Plan participants who paid the Tobacco Surcharge from April 10, 2018, through the present;

E.  An Order requiring NAL to amend any Tobacco Surcharge Wellness Program it intends to maintain to comply with ERISA § 702, 29 U.S.C. § 1182, and its implementing regulations;

F.  An Order compelling the Defendants to make good to the NAL 401(k) and Health Plans all losses to the Plans resulting from Defendants' breaches of fiduciary duty, including restoring to the Plan all losses resulting from paying unreasonable RKA fees and charging an unlawful tobacco surcharge, and restoring to the Plans all profits the Defendants made through use of the NAL 401(k) and Health Plan's assets, and restoring to the Plans all profits which the Participants would have made if the Defendants had fulfilled their fiduciary obligations;

G.  An Order requiring NAL to disgorge all profits received from, or in respect of, the NAL 401(k) and Health Plans, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of constructive trust, or surcharge against NAL as necessary to effectuate relief, and to prevent NAL's unjust enrichment;

H.  An Order enjoining Defendants from any further violation of their ERISA fiduciary responsibilities, obligations, and duties;

I.  Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary/consultant or fiduciaries to run the NAL 401(k) and Health Plans and removal of plan fiduciaries deemed to have breached their fiduciary duties;

J.      An award of pre-judgment interest;

K.      An award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

L.      Such other and further relief as the Court deems equitable and just.


Respectfully submitted,

Date: April 10, 2024          **WALCHESKE & LUZI, LLC**

/s Paul M. Secunda
Paul M. Secunda
Wisconsin Bar No. 1074127
235 N. Executive Dr., Suite 240
Brookfield, Wisconsin 53005
Telephone: (414) 828-2372
psecunda@walcheskeluzi.com

**HASSLER KONDRAS MILLER LLP**

Robert P. Kondras, Jr.
Indiana Bar No. 18038-34
100 Cherry Street
Terre Haute, IN 47807
Telephone: 877-656-7602
kondras@hkmlawfirm.com

*Attorneys for Plaintiff and Proposed Class*